IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


MONICA F. BALLENGER and
JOHN L. BALLENGER,

         Plaintiffs,

v.                                    CIVIL ACTION NO.  1:14CV81
                                         (Judge Keeley)

NATIONAL CITY MORTGAGE, INC.,
now known as PNC Mortgage, Inc.,

         Defendant.


MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]

     Pending before the Court is the motion for summary judgment
(Dkt. No. 42) filed by the defendant, National City Mortgage, Inc.,
n/k/a PNC Mortgage, Inc. ("PNC").  For the reasons that follow, the
Court **GRANTS IN PART** and **DENIES IN PART** PNC's motion for summary
judgment.

## BACKGROUND

     This case concerns a PNC mortgage loan obtained by the
plaintiffs, Monica and John Ballenger ("the Ballengers"), and
subsequent loan servicing by PNC.  The questions presented on
summary judgment include:

     1)   Whether PNC breached the contract by force-placing flood
          insurance;

     2)   Whether PNC breached the contract by assessing improper
          or excessive insurance charges;

**MEMORANDUM OPINION AND ORDER GRANTING IN PART**
**AND DENYING IN PART DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]**

3)      Whether PNC breached the contract by attempting
        foreclosure after the Ballengers' default;

4)      Whether PNC breached its implied duty of good faith and
        fair dealing by engaging in bad faith loan modification;

5)      Whether PNC improperly misrepresented the amount owed by
        the Ballengers;

6)      Whether PNC improperly engaged in unconscionable debt
        collection; and,

7)      Whether PNC refused the Ballengers' payments.

**I.    Factual Background**[1]

Monica and John Ballenger, along with their two children, have
lived in their home in Jefferson County, West Virginia, for over
fourteen years (Dkt. No. 1-1 at 4-5).  Their residence sits atop a
hill, twenty to thirty feet away from Bull Skin Run, an adjacent
creek (Dkt. No. 1-1 at 6; Dkt. No. 47-1 at 34).

**A.    The 2007 and 2013 Loans**

In 2007, the Ballengers obtained a mortgage refinance loan
from National City Mortgage, the predecessor of PNC (Dkt. No. 1-1

---

[1] As it must, the Court construes the facts in the light most
favorable to the Ballengers, who are the non-movants.  See <u>Ussery
v. Manfield</u>, 786 F.3d 332, 333 (4th Cir. 2015).

2

at 5; Dkt. No. 42-1 at 2).[2]  On November 6, 2007, PNC conducted a standard flood zone hazard determination, concluding that the Ballengers' property was not located in a flood zone (Dkt. No. 1-1 at 5; Dkt. No. 47-4 at 1).  On December 4, 2007, the Ballengers closed a mortgage loan providing for a principal balance of $232,000 at 6.375% for 360 months, and a monthly payment, including escrow amounts for taxes and insurance, of $1,641.15 (the "2007 loan") (Dkt. No. 1-1 at 5; Dkt. No. 47-3 at 1).

In April of 2010, after the Federal Emergency Management Agency ("FEMA") updated its flood zone maps, PNC notified the Ballengers that their home was now located in a high-risk flood zone (Dkt. No. 1-1 at 5; Dkt. No. 47-5 at 1).  As a result, in May of 2010, PNC force-placed flood hazard insurance, deducting an annual premium of approximately $2,100 from the Ballengers' escrow account (Dkt. No. 47-6 at 1; Dkt. No. 47-17 at 1).

In late 2012, the Ballengers negotiated with PNC to refinance the 2007 loan in order to take advantage of lower interest rates and a supposedly lower monthly payment (Dkt. No. 1-1 at 6).  During

---

[2] PNC acquired National City effective December 31, 2008; the Court will therefore refer to PNC for the remainder of its Opinion. PNC, PNC Completes Acquisition of National City, Acquired Company Information (Dec. 31, 2008), http://phx.corporate-ir.net/phoenix.zhtml?c=107246&p=irol-acquired.

the refinancing process, in December of 2012, PNC informed the Ballengers that they would need to obtain flood insurance from a carrier of their choice, as the flood insurance PNC had force-placed was no longer available (Dkt. No. 42-3 at 2; Dkt. No. 47-11 at 1). On January 30, 2013, the Ballengers obtained a temporary declaration of flood insurance through Allstate for an annual premium of $598, which they paid in full up front (Dkt. No. 42-3 at 2; Dkt. No. 42-4 at 2; Dkt. No. 47-1 at 15; Dkt. No. 47-15 at 2).[3]

Following receipt of the flood insurance binder from Allstate, PNC closed the Ballengers' loan on February 5, 2013. That loan had a starting balance of $221,200, an interest rate of 4.25%, and a monthly payment, including insurance and taxes, of $1,355.59 (the "2013 loan") (Dkt. No. 42-2 at 3; Dkt. No. 47-15 at 1).

Despite the Ballengers' understanding that Allstate had written an adequate policy, on April 19, 2013, and again on May 10, 2013, PNC advised the Ballengers that their flood insurance coverage was insufficient (Dkt. No. 42-6 at 2; Dkt. No. 42-8 at 2;

---

[3] Allstate issued the policy on January 30, 2013, using tentative rates pending receipt of further information from the Ballengers (Dkt. No. 42-5 at 2-4; Dkt. No. 47-14 at 1).

MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]

Dkt. No. 47-1 at 17).[4]  On May 7, 2013, Allstate determined that the Ballengers had underpaid their flood insurance premium by $5,503, following which PNC paid Allstate the difference from the Ballengers' escrow account (Dkt. No. 42-5; Dkt. No. 47-20).  PNC, which had completed an initial escrow account disclosure statement on February 5, 2013, revised the Ballengers' escrow account to accommodate the higher premium (Dkt. No. 47-18 at 1; Dkt. No. 43 at 7).  Beginning in October, 2013, the new annual premium caused the Ballengers' monthly mortgage payment to nearly double (Dkt. No. 1-1 at 8; Dkt. No. 43 at 3; Dkt. No. 42-15 at 2; Dkt. No. 47-21 at 1).

**B.   Loss Mitigation Efforts**

In March, 2013, John Ballenger injured his shoulder at work, tearing his rotator cuff and labrum muscle (Dkt. No. 47-1 at 25; Dkt. No. 47-2 at 7).  His employer considered his injuries repetitious, and therefore not covered by worker's compensation (Dkt. No. 47-2 at 7).  After undergoing surgery in mid-April, John Ballenger was off work until late July or early August of 2013 (Dkt. No. 47-1 at 25).

---

[4]  PNC does not review the sufficiency of its clients' insurance documents prior to closing (Dkt. No. 47-35 at 20).

## MEMORANDUM OPINION AND ORDER GRANTING IN PART
### AND DENYING IN PART DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]

The Ballengers began to fall behind in their mortgage payments throughout the spring and summer of 2013, making their May, June, and July payments late (Dkt. No. 42-7 at 4-8; Dkt. No. 42-9 at 2; Dkt. No. 42-10 at 2).[5]  On August 2, 2013, PNC notified the Ballengers that their mortgage payments were 60 days or more past due and that the loan was in default; it also invited the Ballengers to apply for foreclosure alternatives (Dkt. No. 42-10 at 2; Dkt. No. 47-33).  PNC attempted to contact the Ballengers to discuss their delinquent mortgage payments on August 8 and 22, 2013 (Dkt. No. 47-33 at 3-4).

On September 30, 2013, the Ballengers submitted an application for payment assistance, explaining that a combination of higher flood insurance premiums and John Ballenger's workplace injury had left them unable to pay their mortgage on time (Dkt. No. 42-22 at 2; Dkt. No. 47-34).  As part of that application, the Ballengers disclosed their monthly income and expenses, household assets, and hardship information (Dkt. No. 47-34).

On October 4, 2013, PNC denied the Ballengers' request for assistance because the 2013 loan did not originate on or before

---

[5] The Ballengers admit that they failed to pay their mortgage after July of 2013 (Dkt. No. 47-1 at 19, 33).

MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]

January 1, 2009 (Dkt. No. 42-12 at 2). In that and many subsequent letters, PNC invited the Ballengers to apply for other workout options (Dkt. No. 42-12 at 2; Dkt. No. 47-35 at 15-16; Dkt. No. 47-36). In the following months, Monica Ballenger resubmitted the workout packet "four to five times," re-sending the same packet every time after PNC denied the same (Dkt. No. 47-1 at 21).

Over six months after it first had invited them to apply, PNC informed the Ballengers for the first time on January 29, 2014, that their loan was ineligible for hardship assistance,(Dkt. No. 47-37 at 1). This was despite the fact that PNC had been aware from the beginning of its inability to offer loss mitigation for loans less than 12 months old (Dkt. No. 47-35 at 13).[6]

### C.  The Ballengers' Offers to Make Payments

Throughout the process, whenever the Ballengers offered to make partial payments toward their past due mortgage debt, PNC told them that it did not accept partial payments (Dkt. No. 1-1 at 9; Dkt. No. 42-14 at 3). On October 25, 2013, the Ballengers called PNC in an attempt to make the August, 2013, mortgage payment (Dkt. No. 47-1 at 25; Dkt. No. 47-2 at 18). During that call, a PNC

---

[6] PNC's internal notes indicate that the Ballengers' requests were denied on November 26, 2013, December 3, 2013, and January 17, 2014 (Dkt. No. 47-37).

7

representative informed the Ballengers that PNC would only accept the total past due amount, which included payments for both August and September of 2013 (Dkt. No. 47-1 at 25; Dkt. No. 47-2 at 18; Dkt. No. 47-37 at 7). Based on that representation, the Ballengers did not send in their August payment. <u>Id.</u>

On December 4, 2013, the Ballengers sent a letter to PNC offering to pay $1,500 immediately to mitigate their debt, and to make their January 2014 payment on time (Dkt. No. 47-39). The Ballengers again wrote to PNC on December 23, 2013, seeking assistance and offering to pay $1,000 immediately and the remaining $9,455 owed at the back end of the loan (Dkt. No. 47-39). PNC never retracted its statement that it did not accept partial payments.

### D.    Letter of Map Amendment

After the Ballengers expressed concerns about their higher monthly payment to PNC, loan officer Bonnie Deibler ("Deibler") advised them that they could survey their property and obtain a letter of map amendment ("LOMA") from FEMA indicating that their dwelling fell outside of the high-risk flood zone (Dkt. No. 1-1 at 6-7). As a consequence, in January, 2013, the Ballengers hired a surveyor and learned that, although their dwelling was not located

in a high-risk flood zone, part of their land near the creek was so located (Dkt. No. 1-1 at 6-7; Dkt. No. 47-22).

On October 28, 2013, the Ballengers obtained a LOMA remapping the flood zone and excluding their home as high-risk (Dkt. No. 43 at 3; Dkt. No. 47-23 at 2).[7] That same day, they notified PNC of the LOMA (Dkt. No. 1-1 at 10). On November 8, 2013, PNC acknowledged the LOMA, accepting that high-risk flood insurance was no longer required. Id.; see also Dkt. No. 47-26.

### E. Insurance Refund and Demand for Payments

After receiving the LOMA, in December, 2013, Allstate refunded the insurance premium of $6,107 to PNC, which included $598 paid by the Ballengers (Dkt. No. 1-1 at 10; Dkt. No. 47-20 at 1; Dkt. No. 47-27 at 1). Despite the fully refunded flood insurance, PNC has never returned the $598 paid by the Ballengers, and has continued to charge the Ballengers a higher monthly premium that includes the increased flood insurance (Dkt. No. 1-1 at 10; Dkt. No. 47-2 at 19).

Significantly, on January 14, 2014, PNC made a demand that the Ballengers make mortgage payments for August, September, October,

---

[7] The Ballengers' LOMA was designated as a life of loan determination (Dkt. No. 47-25 at 1).

## MEMORANDUM OPINION AND ORDER GRANTING IN PART
### AND DENYING IN PART DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]

November, and December, 2013, including escrow amounts for the fully refunded flood insurance (Dkt. No. 1-1 at 10; Dkt. No. 47-29 at 1). Again, on February 14, 2014, PNC similarly demanded payments for September, October, November, and December, 2013, and January, 2014, including escrow payments for the fully refunded flood insurance (Dkt. No. 1-1 at 10; Dkt. No. 47-30 at 1).

On March 17, 2014, PNC demanded payment of $10,434.28 (Dkt. No. 1-1 at 10; Dkt. No. 47-32 at 1). On March 18, 2014, a law firm serving as trustee under the Ballengers' deed of trust sent the Ballengers a notice of foreclosure and continuing right to cure default (Dkt. No. 47-31). The notice (1) informed the Ballengers that PNC had accelerated their mortgage and scheduled a foreclosure sale on April 8, 2014; and (2) demanded payment of $17,513.30, including $5,457,35 for the same escrow advance Allstate had fully refunded in December, 2013 (Dkt. No. 1-1 at 11; Dkt. No. 47-31).

Attempting to get assistance with their loan, the Ballengers filed a complaint with the West Virginia Attorney General's Office (Dkt. No. 47-1 at 24). In January, 2014, they retained Mountain State Justice as legal counsel. Following that, on February 3, 2014, the Ballengers requested that PNC direct any further

MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]

communication regarding their mortgage to their attorney (Dkt. No. 47-1 at 26; Dkt. No. 47-35 at 10; Dkt. No. 47-38 at 1).

On March 12, 2014, PNC offered the Ballengers a trial plan to avoid foreclosure that provided for monthly payments of $1,254.29 for 480 months at an interest rate of 4.6250% (Dkt. No. 42-13 at 2, 4). The Ballengers declined the trial plan on April 17, 2014, reminding PNC that they had retained an attorney (Dkt. No. 47-37 at 9).

## II. Procedural Background

On April 7, 2014, the Ballengers filed suit in the Circuit Court of Harrison County, West Virginia (Dkt. No. 1 at 1). On May 9, 2015, PNC removed the case to this Court, invoking its diversity jurisdiction.[8] Id. at 1, 3.

In Count One of their complaint, the Ballengers allege that PNC breached the contract in the following ways: (1) by obtaining an unnecessary flood insurance policy and requiring the Ballengers to pay the more expensive premium; (2) by assessing improper, excessive insurance charges; (3) by refusing the Ballengers' attempts to make payments or mitigate their increasing

---

[8] The Ballengers served PNC through the West Virginia Secretary of State's office on April 10, 2014 (Dkt. No. 1 at 2).

11

**MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]**

indebtedness; (4) by allowing the Ballengers to accrue indebtedness and failing to perform hardship review in good faith after repeatedly inviting the Ballengers to apply; (5) by impairing the Ballengers' right to reinstate by conditioning it upon payment of improper, excessive insurance charges that had been fully refunded by Allstate; and, (6) by electing, in bad faith, to pursue foreclosure after breaching the contract, assessing and demanding improper charges, and impairing the Ballengers' right to reinstate (Dkt. No. 1-1 at 13).

In Count Two, the Ballengers assert that PNC (1) used fraudulent, deceptive, or misleading representations to collect or obtain personal information, in violation of W. Va. Code § 46A-2-127; and (2) used unfair or unconscionable means in an effort to collect a debt, in violation of W. Va. Code § 46A-2-128. Id. at 14. Finally, the Ballengers allege in Count Three that PNC violated W. Va. Code § 46A-2-115 by refusing to accept partial payments. Id. They request maximum civil penalties per violation pursuant to W. Va. Code §§ 46A-5-101(1) and 106, actual damages, and attorneys' fees and costs. Id. at 14-15.

On May 15, 2015, PNC moved for summary judgment, arguing that the Ballengers' breach of contract claim fails as a matter of law

12

because (1) PNC did not force-place high-risk flood insurance; (2) PNC was not obligated by the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. § 2609(c) (2012) ("RESPA") to recalculate the Ballengers' escrow account after receiving the refund from Allstate; (3) the contract expressly permitted foreclosure; (4) PNC engaged in good faith loan modification, including offering a trial modification, which the Ballengers ignored; (5) PNC did not refuse any payment sent by the Ballengers; and, (6) the Ballengers' right to reinstate was never conditioned on improper or excessive insurance charges (Dkt. No. 43 at 1-2). PNC contends that the Ballengers' claims under the West Virginia Consumer Credit Protection Act, W. Va. Code § 46A-2-101 et seq. ("WVCCPA") also fail because it only attempted to collect money due on the note, rather than the insurance premium, and because it never refused any payment. Id. at 2.

On June 5, 2015, the Ballengers opposed PNC's motion for summary judgment, contending that they had set forth triable issues of fact as to each claim (Dkt. No. 47 at 1). As to Count One, the Ballengers argue that questions of material fact exist as to whether PNC breached the contract by (1) improperly purchasing excessive flood insurance and refusing to refund immediately their

MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]

insurance payments, (2) refusing to accept the Ballengers' payments toward their account, and (3) exercising its discretion in bad faith.  Id. at 1-2.  As to Counts Two and Three, the Ballengers argue that they have provided evidence demonstrating that PNC violated the WVCCPA by instructing the Ballengers to apply for loan assistance when none was available, refusing their payments, and attempting to collect flood insurance premiums when none were owed. Id. at 2.

On June 19, 2015, PNC replied, arguing that the two central allegations in the Ballengers' complaint-that PNC force-placed flood insurance and improperly increased the insurance premium—are "demonstrably and indisputably false," thereby necessitating summary judgment in its favor (Dkt. No. 54 at 1-2).

On June 5, 2015, the Ballengers filed objections pursuant to Fed. R. Civ. P. 56(c)(2), in which they argued that the Court should not consider an exhibit to PNC's motion for summary judgment because it was unsworn and unauthenticated (Dkt. No. 48).  PNC opposed the objection, contending that the Court should consider its exhibit because PNC can present it in a form admissible in evidence (Dkt. No. 53).  The matter is now fully briefed and ripe for disposition.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART
## AND DENYING IN PART DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]

### STANDARD OF REVIEW

Summary judgment is appropriate where the "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials" show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c)(1)(A), (a). When ruling on a motion for summary judgment, the Court reviews all the evidence "in the light most favorable" to the nonmoving party. Walker v. Mod-U-Kraf Homes, LLC, 775 F.3d 202, 207 (4th Cir. 2014). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has made the necessary showing, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256 (internal quotation marks and citation omitted).

**MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]**

The "mere existence of a scintilla of evidence" favoring the
nonmoving party will not prevent the entry of summary judgment; the
evidence must be such that a rational trier of fact could
reasonably find for the nonmoving party.  <u>Id.</u> at 248–52.

<u>DISCUSSION</u>

**I.   Rule 56(c) Objection**

The Ballengers have objected to Exhibit E of PNC's motion for
summary judgment, which is comprised of a series of letters from
Allstate informing the Ballengers that they had submitted
insufficient information to obtain an accurate flood insurance
quote, requesting supplemental information, and notifying them of
their increased premium (Dkt. No. 42-5).  The Ballengers contend
that Exhibit E, obtained from third-party Allstate, "constitute[s]
inadmissible hearsay" because it has not been authenticated (Dkt.
No. 48 at 2).  PNC contends that, under the current iteration of
Fed. R. Civ. P. 56, it need only show that Exhibit E <u>could</u> be
presented in an admissible form (Dkt. No. 53 at 2).  PNC avers that
it is able to authenticate the documents through an Allstate
custodian, thereby satisfying the provisions of Fed. R. Evid.
803(6).  <u>Id.</u> According to PNC, the Ballengers should have produced

16

MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]

the documents in Exhibit E themselves, thereby abrogating the need

for PNC to obtain the documents from Allstate.  <u>Id.</u> at 4.

Pursuant to Fed. R. Civ. P. 56(c)(2), any party may object to

material cited on summary judgment that "cannot be presented in a

form that would be admissible in evidence."  <u>See</u> <u>Humphreys &</u>

<u>Partners Architects, L.P. v. Lessard Design, Inc.</u>, 790 F.3d 532, n.

4 (4th Cir. 2015) (noting that the 2010 Amendments to the Federal

Rules of Civil Procedure eliminated the requirement that documents

submitted in support of summary judgment <u>must</u> be authenticated).

The proponent of evidence bears the burden of establishing that the

objected-to material is admissible as presented, or to explain the

anticipated admissible form.  <u>Deakins v. Pack</u>, 957 F. Supp. 2d 703,

752 (S.D.W. Va. July 12, 2013) (internal quotations omitted).

Fed. R. Evid. 803 provides certain exceptions to the rule

against hearsay, including an exception for records of a regularly

conducted business activity.  Fed. R. Evid. 803(6).  The proponent

may introduce a "record of an act, event, condition, opinion, or

diagnosis" so long as (1) the record was made at or near the time

of the event, by or from information transmitted by someone with

knowledge; (2) the record was kept in the course of a regularly

conducted business activity; (3) making such a record was a regular

MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]

practice of that activity; (4) these conditions are shown by the testimony of a custodian or other qualified witness; and, (5) "the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6). See Lorraine v. Markel Amer. Ins. Co., 241 F.R.D. 534, 552 (D. Md. 2007) (explaining that the authenticity analysis for business records pursuant to Fed. R. Evid. 902(11) has merged into the hearsay analysis).

Here, PNC has met its burden of establishing that Exhibit E could be admissible into evidence. PNC subpoenaed Allstate, which then produced the documents contained in Exhibit E (Dkt. No. 53-1). PNC contends that it is able to produce a witness or custodian from Allstate to authenticate the records in Exhibit E (Dkt. No. 53 at 2). Those documents, which include letters Allstate sent to one of its agencies and the Ballengers, certainly qualify as records kept in the ordinary course of the insurance business, where making such records was regular practice. Fed. R. Evid. 803(6). Given PNC's representation that it could produce a witness from Allstate to testify to the elements of Rule 803(6), the Court **FINDS** that the material in Exhibit E could be presented in admissible form, and therefore **OVERRULES** the Ballengers' objection.

## II.  Count One:  Breach of Contract

In Count One, the Ballengers allege that PNC breached the deed of trust in the following ways:  (1) obtaining an unnecessary flood insurance policy and requiring the Ballengers to pay an excessive insurance premium; (2) assessing improper, excessive insurance charges; (3) refusing the Ballengers' attempts to make payments; (4) allowing the Ballengers' indebtedness to unnecessarily accrue; (5) impairing the Ballengers' right to reinstate; and, (6) electing in bad faith to pursue foreclosure after breaching the contract (Dkt. No. 1-1 at 13).

A deed of trust "conveys title to real property in trust as security until the grantor repays the loan." Arnold v. Palmer, 686 S.E.2d 725, 733 (W. Va. 2009).  Deeds of trust are subject to general contract interpretation principles.  Id.  A plaintiff may bring a breach of contract claim for a violation of a specific claim in the deed of trust.  See Mullins v. GMAC Mortg., LLC, No. 1:09CV704, 2011 WL 1298777, at *2 (S.D.W. Va. Mar. 31, 2011).  In West Virginia, the elements of a breach of contract claim include: (1) a contract between the parties; (2) the breach, or failure to comply with, a term in the contract; and, (3) damages flowing from

MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]

the breach.  <u>Id.</u>  The Court will analyze each of these elements in turn.

A.    **Flood Insurance Policy**

The Ballengers first allege that PNC breached the contract by obtaining an unnecessary flood insurance policy and requiring them to pay an excessive insurance premium (Dkt. No. 1-1 at 13).  PNC contends that the Ballengers undisputably obtained their own flood insurance policy (Dkt. No. 43 at 7).

Paragraph 5 of the deed of trust provides that the Ballengers must maintain property insurance, including flood insurance, "in the amounts . . . and for the periods that Lender requires." (Dkt. No. 42-2 at 6).  The Ballengers have the right to choose their own insurance carrier, subject to PNC's approval, but if they fail to do so, PNC "may obtain insurance coverage, at [its] option and [the Ballengers'] expense."  <u>Id.</u>  Any insurance payments disbursed by PNC "shall become additional debt" of the Ballengers.  <u>Id.</u>  The Ballengers' monthly mortgage payments include escrow "premiums for any and all insurance," including flood insurance.  <u>Id.</u> at 5.

After carefully reviewing the record, there is no genuine dispute as to whether PNC force-placed flood insurance for the 2013

loan.[9] On November 22, 2012, FEMA informed the Ballengers that their residence was located in a special flood hazard area, thus necessitating the purchase of flood insurance (Dkt. No. 42-3 at 2). PNC then informed the Ballengers in December, 2012, that they would need to obtain flood insurance from a carrier of their choosing (Dkt. No. 42-3 at 2; Dkt. No. 47-11 at 1).

On January 30, 2013, the Ballengers obtained a temporary declaration of flood insurance through Allstate (Dkt. No. 42-3 at 2; Dkt. No. 42-4 at 2; Dkt. No. 47-1 at 15; Dkt. No. 47-15 at 2). Allstate issued the policy using tentative rates pending receipt of further information from the Ballengers (Dkt. No. 42-5 at 2-4; Dkt. No. 47-14 at 1). Allstate subsequently determined that the Ballengers had underpaid their flood insurance premium by $5,503, following which PNC paid Allstate the difference from the Ballengers' escrow account (Dkt. No. 42-5; Dkt. No. 47-20). PNC, which had completed an initial escrow account disclosure statement on February 5, 2013, revised the Ballengers' escrow account to accommodate the higher premium (Dkt. No. 47-18 at 1; Dkt. No. 43 at

---

[9] PNC had previously force-placed flood insurance on the 2007 loan in May 2010; as a result of the 2013 refinancing, however, the Ballengers were obligated to purchase their own flood insurance policy (Dkt. No. 47-6 at 1; Dkt. No. 47-17 at 1; Dkt. No. 42-3 at 2; Dkt. No. 47-11 at 1).

7).  The new annual premium caused the Ballengers' monthly mortgage payment to nearly double beginning in October, 2013 (Dkt. No. 43 at 3; Dkt. No. 42-15 at 2; Dkt. No. 47-21 at 1).

The Ballengers' assertion that PNC purchased a more expensive policy without providing sufficient notice is completely unsupported by the record (Dkt. No. 47 at 14-15).  To the contrary, the evidence of record confirms that the Ballengers purchased the flood policy from Allstate, that Allstate determined the Ballengers had underpaid their flood insurance premium, and that Allstate then assessed PNC the difference.  After PNC paid Allstate the increased premium, it deducted that premium from the Ballengers' escrow account, and adjusted their monthly payments accordingly.

The Ballengers have failed to state a breach of contract claim under West Virginia law.  See Mullins, 2011 WL 1298777, at *2 (requiring breach as an element of a breach of contract claim). The Court therefore **GRANTS** PNC's motion for summary judgment as to the Ballengers' claim in Count One that PNC breached its contract by obtaining an unnecessary flood insurance policy and requiring them to pay an excessive insurance premium.

MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]

### B.    Improper and Excessive Insurance Charges

Count One also alleges that PNC breached the contract by assessing improper, excessive insurance charges, even after Allstate had refunded PNC the flood insurance premium (Dkt. No. 1-1 at 13).  PNC argues that, under RESPA and the terms of the deed of trust, it was not required to conduct another escrow account analysis until August of 2014 (Dkt. No. 43 at 8-9).  The Ballengers contend that, as of January 6, 2014, PNC admitted that it did not maintain an escrow account for flood insurance, rendering RESPA inapplicable (Dkt. No. 47 at 17).  They contend that PNC was required to refund them all the premiums paid pursuant to the National Flood Insurance Reform Act of 1994 ("NFIRA"), 42 U.S.C. § 4011, et seq. (Dkt. No. 47 at 15-16).

The deed of trust provides that PNC must provide, without charge, "an annual accounting of the [escrow] Funds as required by RESPA" (Dkt. No. 42-2 at 6).  Importantly, if an escrow account contains surplus funds, PNC "shall account" to the borrower for the excess funds in accordance with RESPA; in contrast, if an account contains a shortage or deficiency of funds, PNC "shall notify" the borrower, as required by RESPA, and the borrower must pay PNC the necessary amount to make up the shortage.  Id.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART
### AND DENYING IN PART DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]

In connection with a federally related mortgage loan, RESPA requires a lender to provide an escrow account statement "not less than once for each 12-month period." 12 U.S.C. § 2609(c)(2)(A)-(B) (2012). Notably, a lender "may conduct an escrow account analysis at other times during the escrow computation year." 24 C.F.R. § 3500.17(f)(1)(ii) (2009).[10] Particularly, if a lender advances funds to pay a disbursement from the escrow account, it must conduct an escrow account analysis to determine the extent of the deficiency before seeking repayment from the borrower. Id. If, during the life of the escrow account, a lender determines that a shortage or deficiency exists, it may require the borrower to pay additional deposits to make up the shortage or eliminate the deficiency. 24 C.F.R. § 3500.17(c)(1)(ii); 24 C.F.R. § 3500.17(f)(4)(ii). A lender is exempt from the annual escrow account statement requirement if, at the time the lender conducts

---

[10] Effective June 16, 2014, the Department of Housing and Urban Development removed its regulations under RESPA. Removal of Regulations Transferred to the Consumer Financial Protection Bureau, 79 Fed. Reg. 34224-01 (June 16, 2014). The Consumer Financial Protection Bureau is now responsible for administering RESPA, including issuing applicable regulations. Id. Insofar as the events in this case occurred before June 16, 2014, the Court will use the version of the regulations in effect at that time.

MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]

the escrow account analysis, the borrower is more than 30 days overdue.  24 C.F.R. § 3500.17(i)(2).

Pursuant to NFIRA, a lender may force-place flood insurance, at the borrower's expense, if the borrower fails to obtain flood insurance on any improved real estate within a special flood hazard zone.  42 U.S.C. § 4012a(e)(1)-(2)(2014).  If a borrower obtains flood insurance coverage, the lender must, within 30 days, terminate force-placed insurance and refund all premiums paid by the borrower.  42 U.S.C. § 4012a(e)(3).  A lender must accept an insurance policy declarations page as confirmation of existing flood coverage.  42 U.S.C. § 4012a(e)(4).  If the borrower provides the lender with a letter stating that the subject property is not in a special flood hazard area, the lender has no obligation to require the purchase of flood insurance.  42 U.S.C. § 4012a(e)(5)(B).  The provisions of RESPA apply to escrow accounts established pursuant to NFIRA.  42 U.S.C. § 4012a(d)(3).

NFIRA is inapplicable to the case at bar for several reasons. First, the provisions of NFIRA cited by the Ballengers apply to lender-placed flood insurance.  42 U.S.C. § 4012a(e).  The Court, however, has already concluded that PNC did not force-place flood insurance in connection with the Ballengers' 2013 loan.

MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]

Furthermore, the Ballengers' argument that RESPA is inapplicable
lacks merit; RESPA squarely applies to the escrow account
maintained by PNC (Dkt. No. 42-2 at 3, 5-6).[11]  See 12 U.S.C. §
2609(c).

The record establishes that, at the time it originated the
loan, on February 5, 2013, PNC completed an initial escrow account
disclosure statement (Dkt. No. 47-18 at 1).  After Allstate
notified PNC of the Ballengers' increased flood insurance premium,
PNC adjusted the Ballengers' escrow account on August 19, 2013, in
order to accommodate the higher premium (Dkt. No. 42-5 at 5; Dkt.
No. 42-15 at 2).

The Ballengers obtained a LOMA excluding their home from the
high-risk flood zone on October 28, 2013, and they informed PNC of
the change (Dkt. No. 47-23 at 2).  On November 8, 2013, PNC
acknowledged receipt of the LOMA and the fact that high-risk flood
insurance was no longer required.  Id.; see also Dkt. No. 47-26.
On November 8, 2013, it informed the Ballengers that it would
conduct an escrow analysis to adjust their monthly payment and

---

[11] The Ballengers argue that the definition of force-placed
insurance under RESPA does not include hazard insurance required by
the Flood Disaster Protection Act of 1973, thereby rendering RESPA
inapplicable (Dkt. No. 47 at 5, n. 1).  See 12 C.F.R. §
1024.37(a)(2)(i) (2014).

### MEMORANDUM OPINION AND ORDER GRANTING IN PART
### AND DENYING IN PART DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]

refund any funds collected for the flood insurance premium (Dkt. No. 47-26). In December, 2013, Allstate refunded PNC the insurance premium of $6,107, which included $598 paid by the Ballengers (Dkt. No. 47-20 at 1; Dkt. No. 47-27 at 1). PNC, however, never returned the $598 to the Ballengers (Dkt. No. 47-2 at 19).

On January 14, 2014, PNC demanded that the Ballengers make payments for August through December, 2013, in an amount that included escrow payments for the fully refunded flood insurance (Dkt. No. 1-1 at 10; Dkt. No. 47-29 at 1). On February 14, 2014, PNC again demanded payments for September through December, 2013, as well as January, 2014, including escrow payments for the fully refunded flood insurance (Dkt. No. 1-1 at 10; Dkt. No. 47-30 at 1). On March 17, 2014, PNC demanded payment of $10,434.28 (Dkt. No. 1-1 at 10; Dkt. No. 47-32 at 1). On March 18, 2014, a law firm serving as trustee under the Ballengers' deed of trust sent them a notice demanding payment of $17,513.30, including $5,457,35 for escrow advances that were fully refunded by Allstate (Dkt. No. 47-31).

These facts establish a genuine dispute of material fact as to (1) whether PNC breached the contract by refusing to conduct an escrow account analysis after receiving the refund from Allstate when it promised to do one in its November 8, 2013, letter; and,

27

MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]

(2) whether PNC breached the contract by continuing to bill the
Ballengers for the refunded escrow amount, even after acknowledging
that it would return any funds collected for the premium.

Although the four corners of RESPA do not obligate PNC to
conduct an escrow account analysis after it receives a flood
insurance premium refund, the deed of trust does obligate it to
account to the Ballengers for any excess funds in the escrow
account (Dkt. No. 42-2 at 6). Additionally, after it received the
LOMA, PNC represented to the Ballengers on November 8, 2013, that
it would conduct an escrow analysis to adjust their monthly
payment, something it subsequently failed to do (Dkt. No. 47-26 at
1).

That PNC continued to bill the Ballengers at a higher rate,
including the fully refunded escrow advance, for months after it
received a refund from Allstate, is troubling. Even if RESPA did
not require PNC to conduct an escrow account analysis until August,
2014, it surely never gave PNC license to continue billing the
Ballengers for amounts they clearly did not owe. The Court
therefore **DENIES** PNC's motion for summary judgment as to the
Ballengers' claim that it breached the contract by assessing
improper insurance charges.

MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]

### C.   The Ballengers' Attempts to Make Payments

The Ballengers allege that PNC breached the contract or the implied covenant of good faith and fair dealing by refusing their attempts to make payments or otherwise mitigate their increasing indebtedness (Dkt. No. 1-1 at 13).  PNC argues that the Ballengers "have not produced any evidence that they submitted any payments that were refused by PNC," but, rather, "admit they never submitted any payments . . . ." (Dkt. No. 43 at 12).  The Ballengers contend that PNC refused to accept their payments in derogation of the deed of trust (Dkt. No. 47 at 18).

By its terms, the deed of trust provides the Ballengers with the right to pay principal, interest, and escrow payments when due (Dkt. No. 42-2 at 4).  Nevertheless, under the deed of trust, PNC retains the right to "return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current." Id. at 5.  By accepting any payment insufficient to bring the loan current, PNC does not waive its right to refuse such payments in the future.  Id.  Nor is PNC obligated to apply insufficient payments at the time it accepts them; rather, it can hold the funds until the borrower brings the loan current. Id.

MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]

West Virginia law implies a covenant of good faith and fair dealing in every contract for the purpose of evaluating a party's performance of that contract. Staats v. BAC Home Loans Servicing, LP, No. 3:10CV68, 2011 WL 12451606, at *5 (N.D.W. Va. June 7, 2011) (Bailey, J.)(citing Knapp v. Amer. Gen. Fin., Inc., 111 F.Supp. 2d 758, 767 (S.D.W. Va. 2005)). This covenant, however, does not grant contracting parties rights inconsistent with those expressly set forth in the contract. Id. (quoting Barn-Chestnut, Inc. v. CFM Dev. Corp., 457 S.E.2d 502, 509 (W. Va. 1995) (internal quotations omitted)). West Virginia does not recognize a stand-alone cause of action for breach of the covenant of good faith and fair dealing; rather, "this claim will live or die by the [express] breach of contract claim. . . ." Id. (quoting Clendenen v. Wells Fargo Bank, N.A., No. 2:09CV557, 2009 WL 4263506, at *5 (S.D.W. Va. Nov. 24, 2009)).

On October 25, 2013, the Ballengers attempted to make their August mortgage payment (Dkt. No. 47-1 at 25; Dkt. No. 47-2 at 18). During that call, PNC informed the Ballengers that it would only accept the total past due amount—both August and September of 2013—as payment (Dkt. No. 47-1 at 25; Dkt. No. 47-2 at 18; Dkt. No.

MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]

47-37 at 7).[12]  Based on that representation, the Ballengers did not send in their August payment (Dkt. No. 47-2 at 18).  On December 4, 2013, the Ballengers sent PNC a letter offering to pay $1,500 immediately to mitigate their debt, and to make their January 2014 payment on time (Dkt. No. 47-39).  On December 23, 2013, the Ballengers sent a letter to PNC offering to pay $1,000 immediately and the remaining $9,455 owed at the back end of the loan (Dkt. No. 47-39).  PNC never retracted its statement that it did not accept partial payments.

Although PNC's practice of prohibiting partial payments is objectionable, the same does not breach the contract.  Under the express terms of the deed of trust, PNC may refuse to accept payments that fail to bring the loan current (Dkt. No. 42-2 at 5).  Had the Ballengers sent in such a payment, PNC was not contractually obligated to apply it to their account until they brought the loan current.  Id.  The Ballengers do not present–and the Court cannot find–any law supporting the proposition that such contractual language is unconscionable or otherwise unenforceable.  To the contrary, see Spoor v. PHH Mortg. Corp., No. 5:10CV42, 2011

---

[12]  PNC's internal customer service notes reflect that a borrower called to see if he could make payments and was advised that PNC did not accept partial payments (Dkt. No. 47-37 at 7).

MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]

WL 883666, at *4-5 (N.D.W. Va. Mar. 11, 2011) (Stamp, J.)
(dismissing the plaintiff's breach of contract claim after the
defendant directed her to not make any partial payments). Any
claim based on the implied covenant of good faith and fair dealing
likewise fails, as it must "live or die" by the express breach of
contract claim. See Staats, 2011 WL 12451606, at *5 (internal
quotations omitted). The Court therefore **GRANTS** PNC's motion for
summary judgment as to the Ballengers' claim that PNC breached the
contract by refusing to accept payments.[13]

### D. Foreclosure Alternative Review

The Ballengers allege that PNC breached the contract by
allowing their indebtedness to unnecessarily accrue, and
interfering with their right to receive the benefit of the contract
by "refusing offers to pay, then failing, in bad faith, to
appropriately conduct review for foreclosure alternatives after
repeatedly inviting [them] to apply for the same." (Dkt. No. 1-1
at 13). PNC argues that it had no duty to execute a loan
modification or pursue loss mitigation options, as the deed of

---

[13] This holding in no way affects the Ballengers' claim in
Count Three of their complaint that PNC violated the WVCCPA by
refusing to accept such payments, see infra.

trust gave it an express, absolute right to foreclose on the property if the Ballengers defaulted (Dkt. No. 43 at 10).

Pursuant to the terms of the deed of trust, the lender must give the borrower notice of any breach before accelerating the mortgage (Dkt. No. 42-2 at 12). If the borrower does not cure the default by the specified date, the lender may accelerate the mortgage, requiring "immediate payment in full of all sums . . . without further demand." Id. The lender also may invoke its power of sale, and "any other remedies" permitted by law. Id. In West Virginia, a lender is not obligated to pursue remedies not set forth in the deed of trust in an attempt to cure default before pursuing foreclosure. Lucas v. Fairbanks Capital Corp., 618 S.E.2d 488, 498-99 (W. Va. 2005).

On August 2, 2013, PNC notified the Ballengers that their mortgage payments were 60 days or more past due, and, consequently, their loan was in default; it also invited the Ballengers to apply for foreclosure alternatives (Dkt. No. 42-10 at 2; Dkt. No. 47-33). On September 30, 2013, the Ballengers submitted an application for payment assistance (Dkt. No. 42-22 at 2; Dkt. No. 47-34). On October 4, 2013, PNC denied the Ballengers' request for assistance because the 2013 loan had not originated on or before January 1,

2009 (Dkt. No. 42-12 at 2).   In that, and in many subsequent letters, PNC invited the Ballengers to apply for other workout options (Dkt. No. 42-12 at 2; Dkt. No. 47-35 at 15-16; Dkt. No. 47-36).   In the following months, Monica Ballenger resubmitted the workout packet "four to five times," "taking the same packet every time and re-sending it" after PNC denied the same (Dkt. No. 47-1 at 21).   The first time PNC informed the Ballengers that their loan was completely ineligible for hardship assistance was on January 29, 2014, more than six months after first inviting them to apply (Dkt. No. 47-37 at 1).   According to the Ballengers, PNC was aware from the beginning that it was unable to offer loss mitigation for loans less than 12 months old (Dkt. No. 47-35 at 13).   PNC later offered the Ballengers a trial modification plan on March 12, 2014 (Dkt. No. 42-13 at 2, 4), which the Ballengers declined on April 17, 2014 (Dkt. No. 47-37 at 9).

In accordance with the terms of the deed of trust, PNC notified the Ballengers that they were in default on August 2, 2013.   After that, PNC repeatedly reviewed the Ballengers' account for foreclosure alternatives, but never promised them that they would receive a loan modification; it merely represented that it would consider them.   To the extent the Ballengers are arguing that

PNC had some duty to consider them for loan modification in good faith, PNC was not required to do so by West Virginia law unless a provision of the deed of trust so provided. Spoor, 2011 WL 883666, at *6 (finding that, absent an applicable provision in the deed of trust, lenders are not required to consider a loan modification in good faith).

Because PNC had no duty under the deed of trust to consider the Ballengers for loan modification, the Court **GRANTS** PNC's motion for summary judgment as to the Ballengers' claim that it breached the contract by failing to appropriately conduct foreclosure review.

**E.   Right to Reinstate**

The Ballengers contend that PNC impaired their contractual right to reinstate by conditioning that right "upon payment of improper and excessive insurance charges that had been fully refunded" (Dkt. No. 1-1 at 13).  PNC failed to squarely address this contention in its motion for summary judgment (Dkt. No. 43 at 11).  Nonetheless, the Ballengers argue that PNC impaired their right to reinstate by "prolonging a futile loss mitigation process for over six months, all the while refusing [their] attempts to make payments toward the accruing arrears."  (Dkt. No. 47 at 19).

### MEMORANDUM OPINION AND ORDER GRANTING IN PART
### AND DENYING IN PART DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]

The deed of trust provides that, in its notice of default, the lender must notify the borrower of the right to reinstate after acceleration (Dkt. No. 42-2 at 12). The deed of trust does not otherwise define the "right to reinstate." See Dkt. No. 42-2. PNC's August 2, 2013, letter advised the Ballengers that they could reinstate their loan by paying "the total amount you owe, in a lump sum payment and by a specific date." (Dkt. No. 42-10 at 6).

As discussed earlier, the Ballengers attempted to make partial payments toward their arrears; they concede, however, that they were unable to pay the entire past due amount at once. Throughout this time, PNC continued to charge them not only for principal and interest on their mortgage, but also for the fully refunded flood insurance. Taking all reasonable inferences in the Ballengers' favor, they have created a genuine factual dispute regarding whether PNC's actions impaired their contractual right to reinstate. See Petty v. Countrywide Home Loans, Inc., No. 3:12-6677, 2013 WL 1837932, at *10 (S.D.W. Va. May 1, 2013) (denying a motion to dismiss when the plaintiff alleged that the defendant breached the deed of trust by interfering with his right to reinstate the loan and by refusing to accept payments). The Court therefore **DENIES** PNC's motion for summary judgment as to the

36

**MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]**

Ballengers' claim that PNC impaired their contractual right to reinstate by conditioning that right upon payment of fully refunded insurance charges.

**F.   Bad Faith**

The Ballengers allege that PNC elected in bad faith to pursue foreclosure "after breaching express provisions including prohibiting payments, assessing and demanding improper charges, and impairing [their] right to reinstate in violation of the parties' agreement." (Dkt. No. 1-1 at 13). PNC contends that, pursuant to the deed of trust, it has an absolute right to foreclose upon default (Dkt. No. 43 at 9-10).

Pursuant to the terms of the deed of trust, after giving appropriate notice to the borrower, the lender, at its option, "may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale . . . ." (Dkt. No. 42-2 at 12). Insofar as PNC could not have breached the contract by pursuing foreclosure, a remedy explicitly permitted by the contract, the Ballengers have failed to allege a viable bad faith claim premised upon the same. See Staats, 2011 WL 12451606, at *5. The Court therefore **GRANTS** PNC's

MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]

motion for summary judgment as to the Ballengers' claim that it elected to pursue foreclosure in bad faith.

## III.  Count Two: Misrepresentations and Unconscionable Conduct

In Count Two, the Ballengers allege that PNC violated the WVCCPA by (1) using fraudulent, deceptive, or misleading representations to obtain information about the Ballengers; and, (2) using unfair or unconscionable means in efforts to collect a debt (Dkt. No. 1-1 at 14).  PNC argues that the Ballengers' WVCCPA claims fail "for all the reasons discussed herein with respect to Plaintiffs [sic] breach of contract claims." (Dkt. No. 43 at 13). The Ballengers contend that a question of material fact exists as to whether (1) PNC's misrepresentations amounted to unlawful debt collection under the WVCCPA, and (2) PNC engaged in unconscionable means to attempt to collect a debt (Dkt. No. 47 at 21).

### A.   Fraudulent, Deceptive, or Misleading Representations

Pursuant to W. Va. Code § 46A-2-127, a debt collector is prohibited from using "any fraudulent, deceptive or misleading misrepresentation or means" in order to "collect or attempt to collect claims or to obtain information concerning consumers." W. Va. Code § 46A-2-127.  Although § 46A-2-127 applies generally, the Act also enumerates specific conduct deemed violative, including

38

MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]

any false representation that the debt collector "has in his
possession . . . something of value for the consumer that is made
to solicit or discover information about the consumer." W. Va.
Code § 46A-2-127(b). The Act also prohibits any representation
that a consumer's existing obligation may be increased by charges
or fees when, in fact, no such charges or fees may be legally added
to the existing obligation. W. Va. Code § 46A-2-127(g).

The Ballengers allege that PNC violated § 46A-2-127(b) by
representing that loss mitigation was available when it was not,
thereby obtaining information about the Ballengers through
unnecessary loss mitigation applications. W. Va. Code § 46A-2-
127(b). On September 30, 2013, the Ballengers submitted an
application for payment assistance to PNC; as part of that
application, they disclosed their monthly income and expenses,
household assets, and hardship information (Dkt. No. 47-34). On
October 4, 2013, PNC denied the Ballengers' request for assistance
because the 2013 loan did not originate on or before January 1,
2009 (Dkt. No. 42-12 at 2). In that and many subsequent letters,
PNC invited the Ballengers to apply for other workout options (Dkt.
No. 42-12 at 2; Dkt. No. 47-35 at 15-16; Dkt. No. 47-36). In the
following months, Monica Ballenger resubmitted the workout packet

MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]

"four to five times," "taking the same packet every time and re-sending it" after PNC denied the same (Dkt. No. 47-1 at 21). The first time PNC informed the Ballengers that their loan was completely ineligible for hardship assistance, however, was on January 29, 2014, over six months after it first invited them to apply (Dkt. No. 47-37 at 1).

Viewed in the light most favorable to the Ballengers, the facts support the inference that PNC, although always aware of its inability to offer loss mitigation for loans less than 12 months old, nevertheless falsely represented to the Ballengers that loss mitigation options were available in order to obtain information about them (Dkt. No. 47-35 at 13). W. Va. Code § 46A-2-127(b); see Ranson v. Bank of Amer., N.A., No. 3:12-5616, 2013 WL 1077093, at *9 (S.D.W. Va. Mar. 14, 2013)(finding that the plaintiff pleaded a sufficient claim under the WVCCPA when he alleged that the defendant misrepresented that loan modification options were available in order to obtain information).

Similarly, PNC told the Ballengers that their debt would be increased without accounting for the fully refunded escrow payments. W. Va. Code § 46A-2-127(g). See Patrick v. PHH Mortg. Corp., 937 F.Supp. 2d 773, 785 (N.D.W. Va. 2013) (denying defendant

lender's motion to dismiss after the plaintiff alleged that it sought collection of past due amounts that were no longer due). Even though it had received a full refund of the insurance premium from Allstate, PNC sought to collect a higher monthly premium from the Ballengers that included the flood insurance. The Ballengers therefore have created a genuine dispute as to whether PNC represented to them that their obligation would be increased by the improper escrow charges.

**B.   Unfair or Unconscionable Means**

Pursuant to W. Va. Code § 46A-2-128, a debt collector is prohibited from using unfair or unconscionable means to collect or attempt to collect a debt. Notwithstanding the general applicability of W. Va. Code § 46A-2-128, a debt collector is specifically prohibited from communicating with a consumer more than 72 hours after the debt collector receives written notice that the consumer is represented by an attorney regarding the subject debt. W. Va. Code § 46A-2-128(e). To be effective, such notice must state the attorney's name, address, and telephone number, and be sent to the debt collector's registered agent. Id. If the debt collector is not registered with the West Virginia Secretary of

**MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]**

State, the notice must be sent to its principal place of business.
Id.

In January, 2014, the Ballengers retained Mountain State
Justice as counsel, and on January 31, 2014, requested that PNC
direct any further communication to their counsel (Dkt. No. 47-38
at 1).  That notice, which was mailed to PNC's address in Dayton,
Ohio, included counsel's name, address, and phone number, and was
marked as received by "Customer Service Research" on February 3,
2014.  Id.

Despite this notice, on March 12, 2014, PNC directly offered
the Ballengers a trial plan to avoid foreclosure that provided for
monthly payments of $1,254.29 for 480 months at an interest rate of
4.6250% (Dkt. No. 42-13 at 2, 4).  The Ballengers declined the
trial plan on April 17, 2014, reminding PNC that it needed to
communicate with their attorney (Dkt. No. 47-37 at 9).

The Ballengers have met their burden of creating a genuine
dispute as to whether PNC violated § 46A-2-128(e).  It is
undisputed that the Ballengers sent PNC a letter advising them to
speak with their attorney, who would be handling their case from
that point on, and provided PNC with the name, address, and phone
number of the attorney, as required by statute.  Although the

**MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]**

record is murky as to whether service at PNC's Dayton, Ohio, address was proper under W. Va. Code § 46A-2-128(e), dismissal is inappropriate at this juncture because such fact is in dispute. The Court therefore **DENIES** PNC's motion for summary judgment as to Count Two.

## IV.  Count Three: Refusal of Payments

In Count Three, the Ballengers allege that PNC violated the WVCCPA by refusing to accept their payments "on multiple occasions."[14]  (Dkt. No. 1-1 at 14).  PNC argues that the Ballengers' claim fails as a matter of law because they never attempted to make payments (Dkt. No. 43 at 2, 13).  The Ballengers contend they have stated a viable claim under the WVCCPA by establishing that PNC instructed them not to make payments to their account (Dkt. No. 47 at 22-23).

Pursuant to W. Va. Code § 46A-2-115(c), a lender must credit all payments arising out of a consumer loan transaction upon

---

[14] Although the factual allegations underlying Counts One and Three are similar, a borrower may bring both a common law breach of contract claim and a claim under the WVCCPA.  See Bailey v. Branch Banking & Trust Co., No. 3:10-0969, 2011 WL 2517253, at *2-3 (S.D.W. Va. June 23, 2011); Wince v. Easterbrooke Cellular Corp., 681 F.Supp. 2d 668, 693 (N.D.W. Va. 2010) (Bailey, J.); W. Va. Code § 46A-2-101(e)(3).

MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]

receipt against payments due. "[A]llegations that a lender instructed a borrower to not make payments or that a lender returned payments to a borrower would constitute a plausible claim under § 46A-2-115(c)." <u>McNeely v. Wells Fargo Bank, N.A.</u>, No. 2:13CV25114, 2014 WL 7005598, at *8 (S.D.W. Va. Dec. 10, 2014). <u>See</u> <u>also</u> <u>Petty</u>, 2013 WL 1837932, at *13 (finding that the plaintiffs sufficiently alleged a WVCCPA claim by establishing that the defendant told them not to make any additional payments).

Viewed in the light most favorable to the Ballengers, the facts reflect that PNC representatives advised the Ballengers that they would not accept partial payments, thus leading the Ballengers to withhold any payments at all (Dkt. No. 42-14 at 3; Dkt. No. 47-37 at 7). On October 25, 2013, the Ballengers called PNC in an attempt to make their August mortgage payment (Dkt. No. 47-1 at 25; Dkt. No. 47-2 at 18). During that call, a PNC representative informed them that PNC would only accept the total past due amount for both August and September, 2013, as a payment (Dkt. No. 47-1 at 25; Dkt. No. 47-2 at 18; Dkt. No. 47-37 at 7). Based on that representation, the Ballengers did not send in their August payment (Dkt. No. 47-2 at 18 ("Q: Okay. And, sir, did you send any payment in? Any partial payment in? A: What was the use? Q: Is that a

**MEMORANDUM OPINION AND ORDER GRANTING IN PART**
**AND DENYING IN PART DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]**

'no,' sir? A: No. You're right, we didn't. Because they weren't going to take it no way.")).

On December 4, 2013, the Ballengers sent PNC a letter offering to mitigate their debt by paying $1,500 immediately, and also to make their January 2014 payment on time (Dkt. No. 47-39). On December 23, 2013, the Ballengers wrote to PNC seeking assistance, and offering to pay $1,000 immediately, with the remaining $9,455 to be paid at the back end of the loan (Dkt. No. 47-39). PNC never retracted its statement that it did not accept partial payments. A genuine dispute therefore exists as to whether PNC told the Ballengers not to make partial payments toward their account, thus rendering summary judgment inappropriate as to Count Three. The Court therefore **DENIES** PNC's motion for summary judgment as to Count Three.

### SUMMARY OF THE COURT'S RULINGS

For the reasons discussed, the Court:

1.  **OVERRULES** the Ballengers' Rule 56(c) objections;

2.  **GRANTS IN PART** PNC's motion for summary judgment as to Count One and **DISMISSES WITH PREJUDICE** the following claims:

**MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]**

- that PNC breached the contract by obtaining an unnecessary flood insurance policy and requiring the Ballengers to pay an excessive insurance premium;

- that PNC breached the contract by refusing to accept payments;

- that PNC breached the contract by failing to appropriately conduct foreclosure review; and,

- that PNC elected to pursue foreclosure in bad faith.

3.   **DENIES IN PART** PNC's motion for summary judgment as to the following claims in Count One:

- that PNC breached the contract by assessing excessive, improper insurance charges; and,

- that PNC impaired the contractual right to reinstate by conditioning that right upon payment of fully refunded insurance charges.

4.   **DENIES** PNC's motion for summary judgment as to Counts Two and Three.

It is so **ORDERED**.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 42]**

The Court directs the Clerk to transmit copies of this Order to counsel of record and to enter a separate judgment order.

DATED:  August 26, 2015.


/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE